IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 13, 2014

IN RE D'VANTE P.

Appeal from the Juvenile Court for Bradley County
No. J-10-414      Daniel Ray Swafford, Judge

No. E2013-02148-COA-R3-PT-FILED-MAY 5, 2014

This is a termination of parental rights case, focusing on D'Vante P., the minor child ("Child") of Ashley C. ("Mother") and Sylvester P. ("Father"). The Child was taken into protective custody by the Tennessee Department of Children's Services ("DCS") on October 27, 2010, following investigation of lack of supervision in the home. On October 10, 2012, DCS filed a petition to terminate the parental rights of both parents. The proceeding to terminate Father's parental rights subsequently became a separate action, and Father is not a party to this appeal. Following a bench trial conducted on July 15, 2013, the trial court granted the petition as to Mother upon the court's finding, by clear and convincing evidence, that (1) Mother had failed to substantially comply with the permanency plans and (2) the conditions causing the removal of the Child into protective custody persisted. The court further found, by clear and convincing evidence, that termination of Mother's parental rights was in the Child's best interest. Mother has appealed. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

David K. Calfee, Cleveland, Tennessee, for the appellant, Ashley C.

Robert C. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. Factual and Procedural Background**

DCS originally became involved with the Child's family in September 2010 when DCS received a referral alleging that D'Vante's brother, J'Shon, was exhibiting behavior problems at school. At the time, D'Vante was six years old, and J'Shon was seven years old. The two boys have different biological fathers. An investigator with Children's Protective Services ("CPS"), Kaitlin Hair, visited the home on September 27, 2010. Ms. Hair testified that when she interviewed Mother that day, Mother admitted to having difficulty controlling J'Shon's and D'Vante's behavior. Mother told Ms. Hair that the children had started fires in the carpet by playing with lighters and matches. Ms. Hair observed burn marks in the carpet. The children told Ms. Hair during the initial investigation that Mother slept a great deal during the day, left them without supervision while she slept, and did not respond when they awakened her to ask for food. Ms. Hair explained that the problem had arisen when Mother kept lighters and matches in her purse and left the purse within the children's reach. Ms. Hair acknowledged that during the initial investigation, she did not suspect Mother of any substance abuse.

Following this initial home visit, Ms. Hair completed an official referral to DCS. In response, DCS developed a non-custodial permanency plan with Mother and the children's maternal grandmother. On September 30, 2010, the trial court approved and entered the noncustodial plan, under which Mother's responsibilities were to secure all lighters and matches away from the children, stay awake during the hours the children were awake, take her medication for epilepsy and anxiety as prescribed, and attend counseling. Mother's medical conditions requiring medication were due to a brain injury she suffered after surviving a car accident in 1998 that resulted in epileptic seizures, anxiety, and pain. DCS required Mother to undergo counseling because Mother and the children were coping with the recent loss of a maternal great-grandmother with whom they had been close.

Ms. Hair returned to the home on October 27, 2010, and interviewed the children individually and separately. Both J'Shon and D'Vante reported that they were still playing with lighters and matches and that in the past few days they had begun spraying perfume and igniting it to make a torch. The children told Ms. Hair that Mother knew about their activities. When Ms. Hair confronted Mother regarding the hazards, Mother adamantly denied that the children had been allowed any access to lighters or matches. As both children were in the room during Mother's denial, they began to remind Mother that they in fact had lit fires. According to Ms. Hair, Mother became extremely angry with the children for "telling on her," grabbed a jagged-edged switch from behind the couch, and threatened to beat the children. While Ms. Hair left the room to call her supervisor, she could hear Mother

continuing to threaten the children. When Ms. Hair informed Mother that the children were going to be removed into protective custody, Mother became "extremely threatening and yelling." The maternal grandmother arrived during this incident and confirmed to Ms. Hair that lighters and matches had continued to be within the children's reach. Law enforcement subsequently assisted in the removal and placement of the children into protective custody.

DCS case manager Lisa Blankenship testified that she had worked with the Child from the time he and his brother came into protective custody through the trial two years later. During this time period, three permanency plans were established for the Child. The first permanency plan was created on November 23, 2010, ratified by the trial court on December 16, 2010, and set target goals for May 23, 2011.[1] Mother's responsibilities under the first permanency plan were to obtain a working smoke detector; repair a broken, sharp-edged window; complete parenting classes; address her physical health by keeping all medical appointments and taking medication as prescribed; and complete a mental health intake, following any resultant recommendations.

According to Ms. Blankenship, Mother progressed satisfactorily toward the goals of the first permanency plan through April 2011. She completed the needed safety repairs to her home, maintained supervised visitation with both children, and attended parenting classes. She reported seeing a medication management counselor at Hiwasee Mental Health for assistance with managing her prescribed medications for seizures and anxiety. While progressing under this permanency plan, Mother volunteered to undergo an alcohol and drug assessment, although such an assessment had not been required of her at that time. In April 2011, however, Mother revealed to DCS that she was using marijuana, and Ms. Blankenship testified that she informed the trial court of Mother's admission. Nonetheless, DCS scheduled supervised visitation in Mother's home with an aim toward increasing visitation until Mother and the children were prepared for an unsupervised trial home visit. A second permanency plan, developed on May 20, 2011, and ratified by the trial court on May 26, 2011, set identical responsibilities for Mother as the first plan with a new goal target date of October 15, 2012.

The children were returned to Mother's home for a trial home visit in early June 2011. When Ms. Blankenship visited Mother's home after the children were returned, however, D'Vante and J'Shon informed Ms. Blankenship that Mother continued to use marijuana in the home. In July 2011, DCS personnel requested that Mother submit to a drug screen while

_____

[1]Other than the ratified permanency plans, no documentation of the dependency and neglect proceedings was admitted as evidence during the termination proceedings. We note that according to Mother's brief on appeal, Mother consented to an adjudication of dependency and neglect as to both children during the December 16, 2010 hearing.

she was attending a foster care review meeting. Mother tested positive for marijuana. DCS ended the trial home visit at that point upon the evidence of Mother's continued marijuana use and its contribution to Mother's alleged inability to supervise D'Vante and J'Shon properly.

As the trial court noted in its final order, custody of J'Shon was awarded to his biological father upon the father's petition during the dependency and neglect phase of the case.[2] D'Vante continued residing with the foster mother, M.R., who had cared for both children upon their removal into protective custody. Following termination of the trial home visit with Mother, DCS arranged supervised visitation for her with the Child (D'Vante) at the DCS office in Cleveland, Tennessee. According to Ms. Blankenship, OMNI Vision workers were no longer able to transport the Child to scheduled visits with Mother, as they once had, because Mother began threatening the OMNI Vision workers. Mother missed several visits with D'Vante, including one on his birthday. She also often cut visits short. Although Mother told DCS personnel she could obtain rides from family members, she usually offered a lack of transportation as the reason for missing visits with the Child. The foster mother volunteered to transport the Child to some visits, but Mother also missed these on occasion. Ms. Blankenship further testified that for the most part, Mother telephoned D'Vante approximately once a week, although she had the opportunity to do so every day.

A third permanency plan was created on June 26, 2012, and ratified by the trial court on August 30, 2012. To the original goal of a return to parent, DCS combined a concurrent goal of adoption for the Child. This plan added to Mother's responsibilities that she must attend three Alcoholics Anonymous ("AA") or Narcotics Anonymous ("NA") meetings a week, submit to random drug screens, and demonstrate learned parenting techniques from the parenting classes she had completed. Ms. Blankenship testified that to her knowledge, Mother tested positive for marijuana on every drug screen to which she submitted. Mother had on several occasions told Ms. Blakenship that it was no use testing her because the results would be positive for marijuana. According to Ms. Blankenship, Mother avoided many drug screens during the year preceding trial by either claiming she could not urinate for up to two hours at a time or refusing to answer the door of her home for DCS personnel. Mother also presented no proof that she had followed recommendations for mental health counseling.

---

[2]The foster mother testified that J'Shon left the foster home for his biological father's home in February 2012, and in her brief on appeal, Mother states that J'Shon was placed in his father's custody on or about February 23, 2012.

On October 10, 2012, DCS filed its petition seeking termination of Mother's parental rights on the statutory grounds of abandonment through failure to visit the Child, substantial noncompliance with the permanency plans, and persistence of conditions that led to the Child's removal into protective custody. Following a bench trial conducted on July 15, 2013, the trial court found, by clear and convincing evidence, that (1) Mother had failed to substantially comply with the permanency plans and (2) the conditions causing the removal of the Child into protective custody persisted. The court further found, by clear and convincing evidence, that it was in the best interest of the Child to terminate Mother's parental rights. The trial court entered its final decree on September 11, 2013. Mother timely appealed.

## II. Issues Presented

On appeal, Mother presents three issues, which we have restated as follows:

1. Whether the trial court erred by finding there was clear and convincing evidence that Mother had substantially failed to comply with the statements of responsibilities in the permanency plans.

2. Whether the trial court erred by finding there was clear and convincing evidence that the conditions that led to the Child's removal into protective custody persisted.

3. Whether the trial court erred by finding there was clear and convincing evidence that it was in the best interest of the Child to terminate Mother's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

IV. Substantial Noncompliance with Permanency Plans

The trial court, *inter alia*, terminated Mother's parental rights on the statutory ground that she failed to substantially comply with the reasonable responsibilities set out in her permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) (Supp. 2013) provides, as relevant to this action:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

. . .

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4.

As this Court has previously explained:

Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance.

*In re M.J.B. & M.W.S., Jr.*, 140 S.W.3d 643, 656-57 (Tenn. Ct. App. 2004) (internal citations omitted).

In its findings regarding Mother's efforts under the permanency plans, the trial court stated in relevant portion:

> 1. A permanency plan was created for [Mother] on November 23, 2010. The goal of the permanency plan was reunification with mother. [Mother] was given until May 23, 2011 to complete the following:
>    - Provide the boys a safe home by getting a working smoke detector and repairing a window which had been broken and had jagged sharp edges;
>    - Learn to supervise the children better through completing a parenting class;
>    - Ensure she is physically healthy so that she can take care of the children by going to all doctor appointments and taking medication as prescribed;

- Ensure that she is emotionally healthy by scheduling an intake for counseling and following any recommendations.

These goals were reasonable and were related to remedying the conditions which necessitated removal.

2. The permanency plan was updated several times and included the same requirements. On the third plan drafted on June 26, 2012, the goal of adoption was added as well as the following requirements:
   - Address her marijuana use which continued after completing an intensive alcohol/drug outpatient treatment program on January 17, 2011 by attending three AA/NA sessions every week and submitting to random drug screens.
   - Demonstrate parenting techniques learned from her completed parenting classes, which she completed on December 17, 2010.
   - Her counseling requirement was expanded to include addressing grief, loss, and traumatic life events such as the loss of her older [child] J'Shon to his father's custody, her accident in 1998, and her grandmother's death.

These goals were reasonable and were related to remedying the conditions which necessitated removal.

3. CM [case manager] Blankenship testified that the Court ratified the plans and found that the requirements were reasonably related to remedying the reasons for foster care. This was due to the fact that [Mother] used marijuana sometimes resulting in daylong sleep during which she could not supervise her children properly. She allowed the children free reign of the home despite the fact she was aware they were setting fires and could harm themselves. She failed to properly address her medical needs which often [led] to her having seizures which alarmed the children and left them without supervision. She reported that she suffered from anxiety and depression which was not being treated. All of these posed a risk to the child.

-8-

4. CM Blankenship testified concerning the efforts she made in the reunification of the child with [Mother]. [Mother] was provided with a case manager from DCS and OmniVisions. Permanency plans were developed to help [Mother] understand what she needed to do to correct the problems in her home. DCS and OmniVisions offered transportation to [Mother] to court, meetings, and visits. Regular visitation was provided to [Mother] including weekend visitation at one point. Random drug screens were provided and she was urged to attend drug classes and treatment. The state attempted a trial home visit[.] DCS cared for the child during the time that [Mother] was given to try and complete the requirements of her plan. The child was placed in an OmniVisions foster home so that he could get extra foster care services to help his behavior issues. The child was sent to Joe Johnson Mental Health Center to get medicine for ADHD and medication to help him sleep. He was also provided counseling. The child was provided routine medical and dental care as well as specialized ophthalmologist care for his eyes.

5. [Mother] was consistently encouraged to attend AA/NA meetings and was provided with a schedule of these meetings. She failed to attend [these] meetings. She was offered transportation to visitations initially but this was stopped due to her repeated threats and comments to the case managers who transported her. The child was repeatedly transported to Cleveland to make it easier for the mother to visit and she failed to take full advantage of this.

6. CM Blankenship testified that [Mother] has failed to complete the most important parts of her permanency plan. [Mother] has failed to stop using marijuana, she has not attended AA/NA meetings, she has not remained in counseling to address emotional problems, and she has not gone to a doctor to evaluate her brain injuries to see if there are alternatives for treatment to marijuana use.

7. [Mother] presented no proof concerning her completion of any items that the Department alleges were incomplete.

8.      CM Blankenship testified that [Mother] had made some efforts to comply with the permanency plans when she completed parenting classes, maintained housing, and initially completed an alcohol/drug assessment and treatment. However, she continued to use marijuana after she completed this treatment.

9.      The Department presented testimony through CM Blankenship that the Department attempted a trial home visit with the mother in an effort to reunify the family. However, due to her continued drug use and failure to address her mental and physical challenges this trial home visit was ended.

Upon careful review, we determine that a preponderance of the evidence supports these findings. As the trial court noted, three permanency plans were created and ratified for the Child. The first two plans set the single goal of "return to parent" and delineated identical responsibilities for Mother, including obtaining a working smoke detector; repairing a broken, sharp-edged window; completing parenting classes; addressing her physical health by keeping all medical appointments and taking medication as prescribed; and completing a mental health intake and following any resultant recommendations. As the trial court expressly found, these requirements were reasonable and related to the conditions that caused the Child to be removed into protective custody because the requirements addressed the safety of the home and Mother's ability to devote attention to safely supervising the children.

Case manager Blankenship acknowledged that Mother made substantial progress toward compliance with the requirements of the first permanency plan throughout the first few months the children were in protective custody, leading to the trial home visit that occurred from approximately early June through mid-July 2011. Mother made the needed safety repairs to her home. She completed parenting classes and satisfactorily maintained visitation with the children. She also reported to Ms. Blankenship that she was seeing a medication management counselor at Hiwassee Mental Health for assistance with managing her prescribed medications. In addition, Mother voluntarily underwent an alcohol and drug assessment and subsequently completed an outpatient substance abuse treatment program on January 17, 2011.

Ms. Blankenship testified further, however, that in April 2011, Mother revealed that she was using marijuana to help her with chronic pain from her 1998 head injury. Although Ms. Blankenship stated that the permanency plan had been updated in April or May 2011 to include goals related to Mother's marijuana use, the second permanency plan, developed on May 20, 2011, and ratified by the trial court on May 26, 2011, was identical to the first permanency plan regarding the concerns and responsibilities delineated for Mother. It was

undisputed, however, that during the May 26, 2011 hearing, DCS informed the trial court of Mother's admitted marijuana use but requested that she be allowed a trial home visit with the children due to her significant progress in reaching the permanency plan goals. Ms. Blankenship stated that once Mother informed her of the marijuana use, she informed Mother that a second alcohol and drug assessment would be required. According to Ms. Blankenship, Mother was obligated from that point forward to demonstrate that she had stopped using marijuana in order to achieve permanency with the children.

The children's trial home visit with Mother began in late May or early June 2011. When Ms. Blankenship visited Mother's home after the children were returned, however, D'Vante and J'Shon reported that Mother continued to use marijuana in the home. In mid-July 2011, DCS personnel requested that Mother submit to a drug screen while she was attending a foster care review meeting. Mother tested positive for marijuana. DCS ended the trial home visit at that point upon the evidence of Mother's continued marijuana use and its contribution to Mother's inability to supervise the children properly.

As the trial court noted in its final order, the third permanency plan, developed a year later on June 26, 2012, and ratified by the court on August 30, 2012, did note the concern of Mother's marijuana use and required her to attend three AA/NA meetings per week and submit to random drug screens. The third permanency plan also required Mother to remain on her prescribed medications for chronic medical conditions and demonstrate learned parenting techniques from the parenting classes she had previously completed. As the trial court also expressly found, these revised requirements were reasonable and related to the conditions that caused the Child to be removed into protective custody because the requirements addressed the underlying cause of Mother's inability to devote attention to safely supervising the children.

According to testimony from Ms. Blankenship and the foster mother, Mother's efforts to comply with the permanency plans decreased significantly following the termination of the trial home visit and J'Shon's placement with his father. Mother frequently missed or abbreviated visits with D'Vante, making it problematic at best for her to demonstrate learned parenting skills. Moreover, Ms. Blankenship testified that in the year between entry of the third permanency plan and trial on July 15, 2013, Mother failed to test negative for marijuana a single time. During this time period, Mother had on at least three occasions told Ms. Blankenship that drug testing her was unnecessary because the results would be positive for marijuana. Mother also avoided many drug screens by either claiming she could not urinate for up to two hours at a time or refusing to answer the door for DCS personnel. During one occasion, Mother told Ms. Blankenship that she had tried to "clean out" and pass a drug screen by drinking vinegar and cranberry juice. According to Ms. Blankenship, following cessation of the trial home visit, Mother actually submitted to two drug screens administered

by DCS, both proving positive for marijuana. She also avoided being screened on nine or ten other occasions. No proof was presented that Mother attended AA or NA meetings or any other type of substance abuse program other than the outpatient treatment program she completed in January 2011.

Mother presented no proof that she had fulfilled the requirements that she participate in mental health counseling and seek medical care to provide alternative methods of dealing with chronic pain apart from marijuana use. Ms. Blankenship did testify that Mother appeared to have up-to-date prescriptions for her seizures and anxiety, although Ms. Blankenship emphasized that there was no way for DCS to determine whether Mother was taking the medications appropriately.

Mother presented no evidence and did not testify at trial. On appeal, she contends that the trial court relied too heavily on Ms. Blankenship's testimony regarding Mother's failed and missed drug screens. She argues that the trial court should not have considered her continued use of marijuana as substantial noncompliance with a reasonable requirement of the revised permanency plan. We disagree.

Ms. Blankenship's testimony could have been more precise regarding the details of Mother's drug screen results, but in total, her testimony demonstrated that Mother repeatedly either tested positive for marijuana, admitted she would test positive, or avoided being tested. We stress again that the trial court's determinations regarding witness credibility are entitled to great weight on appeal. *See Jones,* 92 S.W.3d at 838. The evidence supports the trial court's finding that Mother's drug use was directly related to her failure to properly supervise the Child. It is undisputed that Mother's marijuana use was also directly related to her perception of how to manage her chronic medical conditions and medication. No evidence was presented as to whether Mother had addressed her physical and mental conditions through counseling or other treatment that would have enabled her to adequately supervise the Child. We conclude that clear and convincing evidence exists to justify termination of Mother's parental rights based upon the statutory ground of substantial noncompliance with the statements of responsibilities in the permanency plans.

### V. Persistence of Conditions Leading to the Child's Removal

The trial court also found that Mother's parental rights should be terminated based upon the statutory ground of persistence of the conditions leading to the Child's removal into protective custody. Tennessee Code Annotated § 36-1-113(g)(3) provides as an additional ground for termination of parental rights:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

The trial court made the following factual findings with regard to this statutory ground:

1. The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months; and the conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s) still persist; there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and the continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

2. The record shows it has been over two and a half years since the child was placed into foster care on October 29, 2010, and the majority of the conditions that led to the State's removal of the child persist. [Mother] continued to use marijuana throughout the time the child was in custody despite submitting to two alcohol and drug assessments and completing one intensive outpatient drug treatment program. She has continuously failed to address her drug use, her inability to supervise the child or to get treatment for medical, mental, and emotional conditions.

3.      CM Blankenship testified that [Mother] acknowledged that she uses marijuana to ease the pain from her brain injury and to treat her depression and anxiety. [Mother] presented no proof to contradict the statements of CM Blankenship regarding her continued drug use or inability to safely parent the child.

4.      There is little chance that these conditions will be remedied soon so that the child can be returned safely to the home. Requiring the child to remain in foster care pending [Mother's] resolution of her mental and physical health challenges and her drug issues diminishes the child's chances of being placed into a safe and stable, permanent home, and will require the child to linger in foster care unnecessarily.

Upon a thorough review of the record, we conclude that these findings are supported by a preponderance of the evidence. The Child was removed for a period of more than six months, and the predominant condition leading to removal, namely Mother's inability to provide adequate supervision for the Child, still persisted. There was little likelihood that this condition would be remedied in the near future. The evidence at trial demonstrated that Mother had failed to stop using marijuana and failed to show that she had addressed through medical treatment or counseling the physical and mental conditions she acknowledged led to her marijuana use. The statute provides for termination of parental rights based on this ground for both the persistence of the conditions leading to the Children's removal and "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A); *see, e.g., In the Matter of S.Y., J.Y., & D.Y.*, 121 S.W.3d 358, 370-71 (affirming the trial court's finding of persistent conditions wherein the mother had corrected certain immediate conditions leading to the children's removal but had failed to address underlying "other conditions" that were reasonably probable to lead to the children living in a condition of neglect similar to that prompting their removal if they were returned to the mother).

Mother contends that the fact that the Child and his brother were returned to her for a trial home visit after she voluntarily disclosed her marijuana use demonstrates that the marijuana use was not a persistent condition leading to the Child's removal. This argument is unavailing in light of DCS's immediate termination of the trial home visit upon evidence of Mother's continued marijuana use and the trial court's subsequent ratification of a permanency plan requiring Mother to end her marijuana use and seek alternate means of controlling her chronic conditions so that she could alertly and safely supervise the Child. The evidence also demonstrated that continuation of the parent-child relationship would greatly diminish the Child's chances of integration into a safe, stable, and permanent home.

-14-

We conclude that the trial court, upon clear and convincing evidence, properly terminated Mother's parental rights based on this statutory ground as well.

## VI. Best Interest of Child

When a parent has been found to be unfit by establishment of a statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i) (Supp. 2013) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In determining that termination of Mother's parental rights was in the best interest of the Child, the trial court stated:

1.  [M.R.] testified that she is the current foster parent for the child, D'Vante [P]. She testified that she is extremely bonded to the child and that he responds well to her. She testified that she would be willing to adopt the child should he become available for adoption.

2.  The minor child, D'Vante [P.] testified that he liked his foster home and felt happy there. He testified he was doing well in school and presented the Court with a copy of his grade card and copies of certificates he received. He was very proud of these achievements. He testified that his foster mother had rules he must follow and if he "did the right things he got to do fun things." He said living with the [Rs] was "like eating cake." He testified that he loved his mother, but would like to remain in his current placement.

3.  [Mother] does not appear to have developed a deep and meaningful relationship with the child. Due to her failure to visit the child

regularly, the depth of the relationship existing between the child and [Mother] has diminished even further. [Mother] failed to visit regularly even though the state and the foster parent offered assistance. [Mother] ended visits early and did not take full advantage of phone contact.

4.      [Mother] has failed to make changes in her conduct or circumstances that would make it safe for the child to go home. She continues to use marijuana which renders her unable to care for the child in a safe and stable manner. She has failed to seek treatment for her mental and physical health conditions which could potentially render her unable to care for the child in a safe and stable manner. In addition, [Mother] has shown a propensity toward violence as demonstrated by her threats to the child, the OmniVisions worker, and CM Hair. Past conduct is the best indication of probable future conduct.

5.      Changing caregivers in this stage of the child's life would have a detrimental effect on him. He is bonded to his foster family and wishes to remain there. [M.R.] is willing to adopt the child should he become eligible for adoption. This adoption would provide him a safe and stable permanent home to which the child has already adjusted fully and where he feels safe and accepted.

6.      A child's future must take precedence over un-remedied persistent conditions. In this case, [Mother] has made some effort to address the issues that brought the child into custody; however, D'Vante deserves to integrate into a permanent home as soon as possible, as he has remained in foster care since October 2010.

The trial court therefore concluded that it was in the Child's best interest to terminate Mother's parental rights. We agree. Mother contends that the evidence does not support the trial court's finding that she failed to make an adjustment of circumstances, conduct, or conditions sufficient to allow the Child's safe return to her home. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). Mother argues that because she addressed initial causes of the Child's removal into protective custody by making repairs to her home, completing parenting classes, and seeking medication counseling, she made the adjustments necessary to ensure the Child's safety if he were returned to Mother's care. As we have determined in previous sections of this opinion, however, Mother's initial positive progress toward fulfilling the responsibilities of the first permanency plan was negated by her subsequent failure to address underlying causes of her inability to safely supervise the Child. DCS worked with Mother to facilitate the Child's return to Mother's home for a trial home visit in early June 2011. By mid-July

2011, the trial home visit had been terminated due to Mother's continued substance abuse and resultant difficulty supervising the Child. Spanning two years between the end of that trial home visit and the trial in this action, Mother failed to demonstrate that she had curtailed her marijuana use or sought alternate methods of dealing with her chronic pain and medical problems so that the Child could be safely returned to her care. The trial court's finding that Mother continued abusing a controlled substance also indicates consideration of statutory factor (7), and the finding that Mother failed to address physical and mental health issues contributing to her inability to properly supervise the Child indicates consideration of factor (8). *See* Tenn. Code Ann. §§ 36-1-113(i)(7), (8).

Mother also contends that the evidence does not support the trial court's finding that she failed to maintain a meaningful relationship with the Child because the Child testified that he would like to continue a relationship with Mother. *See* Tenn. Code Ann. § 36-1-113(i)(4). At trial, the Child, who was then eight years old, testified in chambers with counsel for both parties and the guardian *ad litem* present. As the trial court noted, the Child expressed his desire to be adopted by his foster mother and live with her permanently. He explained that although his foster mother, M.R., had "lots of rules," he did "fun stuff" with her and enjoyed living with her. He stated further that with M.R., there were "consequences" if he did "something bad," but that with Mother, "she'll whip you and then let you do anything else that you wanted to do." The Child indicated that he would like to continue visiting with Mother even if he were adopted by M.R. We determine that the trial court properly considered the Child's testimony as one indication of the parent-child relationship.

In finding that the relationship between Mother and the Child had "diminished" and did not appear to be "deep and meaningful," the trial court also considered, *inter alia*, the factor of Mother's visitation with the Child. *See* Tenn. Code Ann. § 36-1-113(i)(3). The court had previously concluded in its final order that DCS had failed to prove the alleged ground of abandonment by failure to visit pursuant to Tennessee Code Annotated § 36-1-113(g)(1). In so concluding, the court stated:

> Based on the testimony of CM Blankenship and [M.R.], it is clear [Mother's] visitation with the child for four consecutive months immediately before the termination petition was filed on October 10, 2012 was not good. During most of this time, [M.R.] was supervising visits and described them as "ok" or "off and on" and said there were "times when it wouldn't be good." [M.R.] also testified [Mother] ended two hour visits thirty to forty-five minutes early. While this evidence shows the visits were not "good," the Court concludes they were more than "token."

As the trial court noted, the evidence demonstrated that Mother did not stop visiting the Child but did miss several visits and cut many visits short in the months preceding the filing of the termination petition. M.R. testified that after J'Shon was placed in the custody of his father, Mother stopped calling to arrange visits with D'Vante from approximately February through May 2012. Mother then began visiting on alternate weekends, but testimony revealed that she often abbreviated visits and missed some visits all together, including one on D'Vante's birthday. Mother presented no evidence to refute this testimony regarding visitation and no evidence regarding the quality of her relationship with the Child.

In addition to its findings regarding the above statutory factors, the trial court also specifically found that changing caretakers at this point in the Child's life would have a detrimental effect on the Child. *See* Tenn. Code Ann. § 36-1-113(i)(5). By the time of trial, the Child had lived with M.R. from October 2010 through July 2013, except for the approximately six-week duration of the trial home visit with Mother. Testimony from Ms. Blankenship, M.R., and the Child demonstrated that the Child had formed a strong bond with M.R. and was flourishing in her care. The Child presented to the court his recent school awards for perfect attendance and maintaining honor roll grades. From a thorough examination of the record before us, we conclude that there is clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## IX.  Conclusion

The judgment of the trial court terminating the parental rights of Mother is affirmed. Costs on appeal are taxed to the appellant, Ashley C. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

-19-